UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

12 CV 6732

------------------------------------------------------------------- x

THE MAYOR OF THE CITY OF NEW YORK,

                                        Plaintiff,

                    -against-

THE COUNCIL OF THE CITY OF NEW YORK,

                                        Defendant.

------------------------------------------------------------------- x

COMPLAINT

Index No.

RECEIVED
SEP 0 5 2012
U.S.D.C. S.D.N.Y.
CASHIERS

        The Mayor of the City of New York, Michael R. Bloomberg, by Michael A. Cardozo, Corporation Counsel of the City of New York, for his complaint against the Council of the City of New York, alleges as follows:

**Preliminary Statement**

        1.      This action challenges the validity of Local Law 37 for the Year 2012 (the "Living Wage Law" or the "Law"), purportedly adopted by the New York City Council ("Council") over the Mayor's veto.  The Law seeks to require specified recipients of financial assistance from the City, as well as any contractors or subcontractors of those recipients, to pay so-called "living" wages, as defined by the Law, to their employees who work on the premises.

        2.      The Mayor vetoed the Living Wage Law because he believes it to be illegal and because he believes that it will harm the City's efforts to continue to attract and generate the business activity that is necessary to support the local economy and the services of New York City government.

        3.      This Law is invalid because it is preempted by State and federal law and because it unlawfully curtails executive powers vested in the Mayor by the New York City Charter ("Charter") and transfers mayoral powers to the Comptroller.  Under the Charter and the

Municipal Home Rule Law ("MHRL"), any changes in the allocation of powers among the branches and officials of City government are invalid unless approved by the voters in a referendum, and this Law was not so approved.

### Preemption

4.     The Living Wage Law is inconsistent with, and preempted by, the State's minimum wage law, codified as Labor Law Art. 19, §§ 650 *et seq.*, which, under governing Court of Appeals precedent, preempts all local wage regulation save for narrow exceptions that are inapplicable to this Law.   It is also in violation of MHRL § 11(1)(f), which prohibits localities from adopting any local law superseding a State statute if that law "applies to or affects any provision of . . . the labor law."   The Law constitutes an effort to impose a regulatory minimum wage on sectors of the City economy, a subject matter reserved to the State under applicable Court of Appeals precedent.

5.     Second, the Living Wage Law is inconsistent with, and preempted by, the New York State Industrial Development Agency Act ("IDA Act"), codified as General Municipal Law ("GML") Art. 18-A, §§ 850 *et seq.*, and particularly by the State law creating the New York City Industrial Development Agency ("NYCIDA"), codified as GML § 917, in that it seeks to dictate the specific terms of projects sponsored by NYCIDA, which is a State-created entity, and interferes with NYCIDA's purpose, stated in the IDA Act, of fostering economic development.   NYCIDA provides eligible businesses with exemptions from certain taxes and with favorable financing based on tax-exempt bonds.   The IDA Act expressly supersedes all inconsistent local laws, and by its terms as well as impliedly, it occupies the field.   This Law impermissibly encroaches on NYCIDA's freedom to exercise the powers conferred on it by the State Legislature to operate within its statutorily designated area.

6.     Third, the Council, in enacting the Living Wage Law, is unlawfully setting the terms of affordable housing construction and rehabilitation projects sponsored by the New York City Department of Housing Preservation and Development ("HPD") pursuant to State laws that grant the authority to set terms exclusively to HPD and/or to the Mayor.  Therefore, the Law is inconsistent with, and preempted by, the State statutory scheme intended to foster the construction of such housing.  That scheme comprises, *inter alia*, GML Art. 16 and Public Housing Finance Law ("PHFL") Articles 8-a, 11, 15, and 22.  Those State laws give the Council either no role or only minor roles that do not include setting business terms.  Because the Living Wage Law would raise the costs of construction and rehabilitation, and therefore reduce the amount of such housing that can be produced, and because through this Law the Council seeks to exceed its role as set forth in the State laws by dictating the specific terms of affordable housing projects sponsored under those State Laws, the Living Wage Law is preempted.

7.     Fourth, the Living Wage Law provides that enforcement orders issued by the Mayor following findings of violations may be filed with one or more county clerks, and that such orders are to have the "full force and effect of a judgment duly docketed in the office of such clerk," so that they can be entered in the same manner as money judgments under the Civil Practice Law and Rules.  These provisions are outside the constitutional home rule powers of the City Council, in that they relate to the courts and the filing of local decisions with county clerks, acting in relation to the court system.  N.Y. Const., Art. IX, §3(a)(2); MHRL §11(1)(e).  For this reason, provisions of the City Charter conferring the effect of court judgments upon specified administrative determinations have consistently been enacted by the State Legislature.  *See, e.g.*, Chapter 593 of the Laws of 1999, now codified as Charter § 1049-a (expanding jurisdiction of the Environmental Control Board to landmarks-related violations to permit docketing of

penalties relating to such violations); County Law § 918 (specifying local entities for which docketing records are maintained by the county clerks).

8.    Fifth, by specifying that employers must pay a specified amount toward employee health insurance or an equal amount in cash wages, the Living Wage Law favors health benefits over other employee benefits and requires employers to tailor their employee benefit plans to conform to New York City law.   It is therefore preempted by the federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*; *see* 29 U.S.C. § 1144(a).

### Curtailment

9.    In requiring that entities that receive City economic development assistance in the form of below-market prices for property or leases must pay specified wages, the Council's Living Wage Law seeks to set the terms by which the City can sell or lease City property for economic development.   In so doing, the Council violates provisions of the Charter that give the Mayor alone the power to set the terms for such dispositions, and unlawfully alters the balance that the Charter creates among the branches of City government.   These Charter provisions are part of a statutory scheme, embodied both in the Charter and in State law, that gives the Mayor and his or her appointees the power and responsibility to set the business terms of economic development projects and to limit the Council's role to consideration of the land use impacts of such projects.   *See* Charter §§ 28(a), 197-c, 197-d, and 384(b); Not-for-Profit Corporation Law ("NPCL") § 1411.

10.    The Living Wage Law, enacted without a referendum, also unlawfully curtails the Mayor's authority by transferring certain mayoral implementation and enforcement powers to the Comptroller.   The Charter neither contemplates nor articulates any role for the

Comptroller as an administrator or enforcer of these laws. Yet, in precisely the same manner as a prior law that was struck down by the courts, the Living Wage Law assigns investigative duties to the Comptroller, who is then to refer violations to the Mayor for mandatory enforcement action. Admin. Code §§ 6-130(d)(4), 6-134(g)(2). The Living Wage Law also unlawfully curtails mayoral power in mandating that the Mayor and the Comptroller share the power to receive complaints and conduct investigations based on such complaints. *Id.* §§ 6-130(e)(1), 6-130(e)(2), 6-134(g)(6), 6-134(g)(8), 6-134(g)(9).

11.     The Living Wage Law is specifically and narrowly targeted at certain recipients of City financial assistance. It cannot, therefore, escape State law preemption on the grounds that it is a law of general applicability that only incidentally touches on City-subsidized economic development; nor can it escape the mandatory referendum requirement on the grounds that it is legislative policymaking that only incidentally infringes on the Mayor's powers. Because the Living Wage Law dictates specific terms of City economic development projects, as well as for all of the other above-stated reasons, it is unlawful and invalid.

### The Mayor's Veto Message

12.     In vetoing the Living Wage Law, the Mayor stated that he believed it to be illegal for the reasons set forth in this Complaint, and he articulated the policy problems inherent in it: that it would "discourage companies from participating in any City programs that involve financial assistance," and "threaten some of the City's most innovative and important economic development projects – the types that have stabilized and revitalized neighborhoods in all five boroughs." Mayor's Message on Vetoing Int. 251-A (Living Wage Bill), at 1 (May 30, 2012).

13.     As the Mayor stated in his veto message, the City's economic development programs are aimed at commercial, industrial, and residential projects that are on the margins, where targeted support induces developers to make investments that would otherwise be

financially unfeasible.   Often, the targeted developments are in low- and moderate-income communities or in economically challenged sectors of the economy.  The City's support for these projects often means the difference between jobs gained and jobs lost.  While acknowledging that the Living Wage Law would result in higher wages for some workers, the Mayor stated his belief that these increases would come at the cost of job creation and a reduction in the opportunities open to entry-level workers.

> 14.     The Mayor expressed his concern that:

>> Some projects that would create jobs may not move forward at all because they are no longer financially viable without the benefit of these incentives.   This is particularly troubling for industrial companies, which provide good-paying, high-quality jobs for hundreds of thousands of New Yorkers.  This bill would make it more difficult for these businesses to stay here and expand at a time when the City should be focused on supporting them.

>> For projects that still do move forward, if the value of these incentives is offset, the increased cost of the projects will be passed along to others – either to taxpayers, in the form of making higher subsidies necessary to incentivize these types of projects, or to the end-user – consumers who will be faced with higher prices for goods and services.

>> Moreover, the penalties included in this legislation – such as recovering financial assistance for non-compliance – would complicate potential lenders' ability to quantify the risks associated with a project, which in turn would make it more difficult for projects that are already financially challenging to access financing, or make financing more costly.  This poses significant challenges for companies in planning for the future, and it could dissuade them from expanding and hiring in New York City.

Mayor's Veto Message, at 2.

> 15.     The Mayor observed that the Living Wage Law may have serious effects on the costs faced by not-for-profit organizations, which, although themselves exempted from paying the mandated higher wages, nonetheless "would bear the burdens of the additional costs

imposed on the contractors, vendors and consultants performing work on their premises." *Id.* at 3.

16.     In describing the bill, the Mayor noted that "[e]mployers would be required to maintain extensive records and to report on hours, wage and benefit information for all [affected] employees, involving onerous requirements and potential penalties that will additionally discourage companies from participating in any City programs that involve financial assistance." *Id.* at 1.

17.     The Mayor concluded that the bill failed "to strike the appropriate balance between improving the employment opportunities of the City's workers and creating opportunities for innovative economic development programs," and its passage, following so quickly on the heels of passage of a "Prevailing Wage Law" applicable to building service workers (also over the Mayor's veto), "raises serious concerns about the long-term ability of the City to continue attracting and generating the business activity that is necessary to support both the local economy and the services of local government." Mayor's Veto Message, at 3-4.

### Jurisdiction and Venue

18.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

19.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 (b), because defendant resides in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

### The Parties

20.     The plaintiff is the Mayor of the City of New York.   The Mayor is "responsible for the effectiveness and integrity of city government operations," and, as the chief executive officer of the City, exercises all the powers vested in the City, except as otherwise

provided by law.  Charter §§ 3, 8.  The Mayor, directly and through his or her appointees, has broad powers, both generally with respect to implementation and enforcement of all local laws and specifically with respect to the fostering of economic development.

          21.     The defendant, the Council of the City of New York, is the legislative body of the City.  *Id.* §§ 21 *et seq.*

### The Living Wage Law

          22.     On April 30, 2012 , the Council passed the Living Wage Law, Intro. 251-A , and the Mayor vetoed it on May 30, 2012.  The Council purported to enact Intro. 251-A as Local Law 37, codified as new Administrative Code § 6-134, as well as a Charter amendment containing related reporting requirements, over the Mayor's veto on June 28, 2012.

          23.     The Council named the Living Wage Law the "Fair Wages for New Yorkers Act."  N.Y.C. Admin. Code § 6-134(a).

          24.     The Living Wage Law provides for the payment of wages higher than the State's statutorily prescribed minimum wage to employees of subject entities that receive financial assistance of over one million dollars from the City or a "City economic development entity" (as defined in the Law) and do not fall within excepted categories, and to successors, contractors, and subcontractors of such entities.

          25.     It requires all "covered employers," other than those exempted under § 6-134(d), to pay no less than a "living wage" to their employees.  § 6-134(c)(1).  "Covered employers" include "financial assistance recipients," tenants, or subtenants in assisted properties that are owned by financial assistance recipients, recipients' concessionaires at assisted sports facilities, and entities that contract with recipients to work for more than 90 days on the premises of assisted properties.  § 6-134(b)(4)(a)-(d).  Any assignee or successor in interest of real property improved or developed with financial assistance is also a "covered employer."  § 6-

134(b)(8). The Law applies to all employees of covered employers in the City, except that where financial assistance is targeted at particular properties, it applies only to employees who work on the assisted premises. § 6-134(b)(5). The requirements of the Law extend for the longer of either the term of the financial assistance or ten years – potentially, long after the role of the City and of the original recipient of City financial assistance has ended. § 6-134(c)(3).

26.     The Living Wage Law does not apply uniformly to all recipients of financial assistance from the City. Many employers are exempted. Section 6-134(d), titled "Exemptions," exempts the following seven categories of employers from all its requirements save for the reporting requirements of § 6-134(f)(2): (1) small businesses; (2) not-for-profit entities; (3) manufacturing; (4) certain affordable housing projects; (5) "grocery stores participating in the Food Retail Expansion to Support Health (FRESH) program"; (6) building services contractors and construction contractors; and (7) a highly particularized exception for:

> Any . . . financial assistance recipient who executed a project agreement and any entity with which such financial assistance recipient contracts or subcontracts, occupying or operating on the premises of property improved or developed within the geographical delineations described in the definition of 'Zone 3 Adjacent Developments,' without regard to whether or not the applicable project is deemed to be a 'Hudson Yards Commercial Construction Project,' as such terms are defined in the first amendment to the Third Amended and Restated Uniform Tax Exemption Policy of the New York City Industrial Development Agency, as approved by the board of directors of the city industrial development agency on November 9, 2010, provided, however, that such exemption shall not extend to any such covered employer who receives financial assistance through the purchase of a condominium in the event that the city or city economic development entity grants such covered employer additional financial subsidies in addition to the financial assistance originally granted pursuant to such project agreement thereafter assigned or otherwise made available to such purchaser following such purchase.

27.     The Law defines "living wage" as compensation of $10 per hour, plus $1.50 in "supplemental health benefits" that may be provided in the form of cash wages, health benefits, or any combination of the two. § 6-134(b)(9). The wage rate is adjusted annually based on the Consumer Price Index for All Urban Consumers. *Id.* The supplemental health benefits amount is adjusted based on the Consumer Price Index for All Urban Consumers for Medical Care. *Id.*

28.     "Financial assistance" encompasses all assistance "for the improvement or development of real property, economic development, job retention and growth, or other similar purposes" that is "paid in whole or in part by the city" and that has a total present value of one million dollars or more. § 6-134(b)(7).

29.     "Financial assistance" is defined very broadly as follows:

> Financial assistance includes, but is not limited to, cash payments or grants, bond financing, tax abatements or exemptions (including, but not limited to, abatements or exemptions from real property, mortgage recording, sales and use taxes, or the difference between any payments in lieu of taxes and the amount of real property or other taxes that would have been due if the property were not exempted from the payment of such taxes), tax increment financing, filing fee waivers, energy cost reductions, environmental remediation costs, write-downs in the market value of building, land, or leases, or the cost of capital improvements undertaken for the benefit of a project subject to a project agreement.

*Id.*

30.     "Financial assistance" includes both direct assistance from the City and assistance provided through a "city economic development entity," defined as "a local development corporation, not-for-profit corporation, public benefit corporation, or other entity that provides or administers economic development benefits and with which the department of small business services serves as a liaison pursuant to paragraph b of subdivision one of section

1301 of the New York city charter." § 6-134(b)(2) and (b)(7).  This includes assistance provided through the New York City Economic Development Corporation ("NYCEDC").  The definition of "financial assistance" suggests that it is intended to encompass entities such as NYCIDA, even though NYCIDA is a State-created public benefit corporation that has little or nothing to do with the Department of Small Business Services.  However, the definition of "financial assistance" explicitly excludes non-discretionary assistance, *i.e.*, assistance given to all persons who meet certain criteria.  *Id.*

31.    The obligations of the Living Wage Law fall in the first instance on covered employers.  They are required to pay the living wage.  § 6-134(c)(1).  Beyond that requirement, they are also required to post and distribute to all employees a notice to be prepared by the Comptroller and distributed by the City setting forth the rights of employees under the Law.  § 6-134(e)(1).  They must maintain payroll records for six years, § 6-134(e)(2), notify other covered employers operating on the premises of their obligations, § 6-134(f)(1), certify annually that they are in compliance with the Law, *id.*, and provide contact information concerning all other covered employers, *id.*  Covered employers are also prohibited from retaliating against any employee who takes any action to enforce rights under the Law.  § 6-134(e)(3).

32.    The Law does not apply to financial assistance provided prior to its enactment, or to projects agreed to prior to enactment, but extension, renewal, or amendment of projects agreements that results in additional assistance being awarded will make the Law applicable.  § 6-134(i)(1).

33.    The Living Wage Law assigns monitoring and investigative responsibility to the Comptroller or, in some provisions, to both the Comptroller and the Mayor.  § 6-134(g).  At the start of the investigation, the Comptroller may request that the City or City economic

11

development entity providing the assistance withhold such assistance.   § 6-134(g)(1). Complaints may be filed either with the Comptroller or the Mayor, and either may investigate. § 6-134(g)(6), (g)(8), and (g)(9).   The Comptroller is required to report the results of any investigation to the Mayor or his or her designee.

34.     In response to the Comptroller's referral, the Mayor "shall . . . where appropriate issue an order, determination, or other disposition." § 6-134(g)(2).  The Mayor may either negotiate a settlement or refer the matter to the Office of Administrative Trials and Hearings for a hearing and disposition.  § 6-134(g)(4).

35.     The Living Wage Law provides for penalties for non-compliance, including back pay with interest at no less than 6%, a civil penalty of up to 200% of the amount found to be due, and, when a final disposition has been entered in two instances within any six-year period, ineligibility for further financial assistance.  § 6-134(g)(2).

36.     The Mayor's order may be docketed with the County Clerk and "shall have the full force and effect of a judgment duly docketed in the office of such clerk," § 6-134(g)(5), although there is no State authorization for this.  "Upon determining that a covered employer is not in compliance, and where no cure is effected," the City or City economic development entity may impose sanctions or recover any financial assistance previously provided.  § 6-134(g)(7).

37.     The Law also creates a private right of action for damages, punitive damages, and injunctive relief, to any person aggrieved.  § 6-134(g)(8) – (g)(12).

38.     Finally, the Living Wage Law contains a provision that urges the City and City Economic Development Entities to prefer proposals of parties who commit to payment of a living wage, and to "strive to achieve a living wage for 75% or more of the hourly jobs created overall."  § 6-134(h)(1).  It further requires the City and City Economic Development Entities to

submit a report for each economic development agreement they enter into, indicating "whether its agreement with the economic development subsidy recipient mandated the payment of a living wage for any jobs created by the project." § 6-134(h)(2).  The report must state how many such jobs will be created "beyond those jobs for which a living wage is required pursuant to this section and a description of the applicable penalties if the wage requirement in the agreement is not ultimately fulfilled.  If the agreement does not include such a mandate, the city or city economic development entity shall explain why such an agreement could not be reached."  *Id.* The City must also submit to the Council an annual report on the numbers of living wage jobs and below-living wage jobs created in connection with projects receiving City financial assistance.  § 6-134(h)(3).

### The Effects of the Living Wage Law

39.    The Living Wage Law would have significant adverse effects on important programmatic and administrative functions of City, City-related, and State-created entities.  As described below, these include economic development projects administered by NYCEDC and NYCIDA, as well as affordable housing development projects supported by HPD.

**A.    Effects on NYCEDC's Economic Development Projects**

40.    NYCEDC is a local development corporation whose goals include creating jobs, generating revenue for the City, and diversifying the City's economy, and particularly its industrial sector, including warehousing and distribution.  *See* NPCL § 1411(a) (stating purposes of local development corporations).  In furtherance of these goals, NYCEDC acquires land from the City and then disposes of it by sale or lease to industrial companies, frequently at less than fair market value.[1]

---

[1] NYCEDC is in the process of restructuring. As part of the restructuring, two separate entities have been formed.  Once the restructuring is complete, one entity, a local development

41.     NYCEDC's industrial offerings are often for vacant land where the City seeks to encourage the construction of new industrial and manufacturing facilities. Because the economics of such ventures are challenging, the projects that NYCEDC pursues frequently require subsidized rents or sale prices in order to be successful.

42.     The Living Wage Law exempts manufacturing projects but not those involving other industrial uses such as warehousing and distribution. Warehousing and distribution often employ significant numbers of entry-level employees. For this reason, the retention and expansion of these facilities would be especially affected by the Law.

43.     The Law would hinder NYCEDC's efforts to foster industry and, consequently, job creation in the City. The wage requirements of the Law would increase the cost of any project subject to them, making even more difficult the economic circumstances that already render many projects unfeasible without government assistance. Some projects may not be viable. Others will only be feasible with increased assistance from NYCEDC in the form of lower sale prices for property, in turn reducing the resources NYCEDC has to pursue other economic development projects and reducing any proceeds to the City from the sale of the property.

**B.      Effects on NYCIDA's Economic Development Projects**

44.     NYCIDA is a State-created public authority, created by GML § 917 pursuant to the IDA Act, GML Art. 18-A, which authorizes the creation of local industrial development

---

corporation, will continue to acquire property directly from the City. The other will be a not-for-profit corporation into which NYCEDC will be merged. The local development corporation will acquire property from the City and will sell the property to the not-for-profit corporation, which will be authorized to dispose of the property in accordance with requirements contained in a Mayoral approval of the sale of City property. This restructuring will not change the impact of the Living Wage Law on the City's economic development programs.

authorities throughout the State.  Consistent with its statutory purpose, NYCIDA's mission is to encourage economic development throughout the five boroughs and to assist in both the retention of existing jobs and the creation and attraction of new ones.

45.     To carry out its mission, NYCIDA is legally empowered to provide a variety of financial benefits including (i) tax-exempt bond financing; (ii) sales and use tax exemptions; (iii) mortgage recording tax exemptions; and (iv) real estate tax exemptions.

46.     Pursuant to the U. S. Internal Revenue Code, interest paid on certain bonds issued by NYCIDA is exempt from federal taxation.  In addition, pursuant to GML § 874, interest paid on bonds issued by NYCIDA is exempt from State and local income taxation. Because of the exemptions from taxation, purchasers of the bonds are willing to accept a lower rate of interest than they would if the interest paid on the bonds were taxable.  The proceeds of these bonds are paid to private parties to use for acquisition and/or construction of facilities, and the private parties in turn pay NYCIDA the amounts NYCIDA needs to pay the principal and the lower cost interest on the bonds.  The result is that companies can borrow at lower cost than if they had to issue taxable bonds.

47.     NYCIDA also has the authority to exempt eligible projects from various taxes and to collect payments in lieu of taxes (known as "PILOTs") that are equal to or less than the amounts of the taxes that would otherwise be applicable.  NYCIDA can exempt sales tax on purchases of machinery, equipment, and construction materials and can replace real estate taxes with a stable level of PILOTs over a long period, thus helping reduce a company's operating costs.  NYCIDA can also help reduce closing costs by exempting a company from the payment of all or part of the mortgage recording tax or deferring the payment obligation.  It may require a company to pay PILOTs that are less than the full tax amount.  By exercising these powers,

NYCIDA can help companies overcome the high tax environment of the City and New York State, which presents one of the major challenges these companies face in expanding their presence in the City.

48. For the 13 projects that closed in Fiscal 2012, NYCIDA agreed to provide financial assistance totaling $56,531,592. At the time of their respective project closings, the recipients of the assistance employed 792 people. With the assistance furnished by NYCIDA, they are expected to create 750 additional jobs. In addition to these closings, NYCIDA's board of directors has approved "inducement resolutions" for 14 other projects, acknowledging that the provision of financial assistance would be appropriate and that without the provision of such assistance the projects would (i) not move forward, or (ii) would only move forward on a significantly smaller scale, or (iii) would take place outside of New York State. These projects continue to move forward in Fiscal 2013. For these 14 "induced" projects, NYCIDA is planning to provide financial assistance totaling $181,392,459 to companies employing a total of over 3,248 people. With the assistance furnished by NYCIDA, these companies are expected to create over 3,672 additional jobs.

49. NYCIDA supports projects that it believes would not occur, or would be significantly smaller or delayed, but for the benefits it provides. The wage requirements in the Living Wage Law will create a direct impediment to NYCIDA's efforts to promote job growth by increasing the cost of development projects and therefore reducing the effectiveness of the tax benefits offered by NYCIDA. In order to induce any given project, NYCIDA will be forced to offer greater benefits than it would have absent the wage requirements. As a result of the Living Wage Law, NYCIDA will be able to pursue fewer projects, or projects of lesser scale.

C.    **Effects on HPD's Affordable Housing Programs**

50.    The Living Wage Law would adversely impact the development and rehabilitation of affordable housing under programs administered by HPD.   Although some affordable housing projects would be exempted from the Law's living wage requirement, others, comprising thousands of units of affordable housing, would not.   The wage requirement increases the operating costs for any development project to which it applies and thus undermines the purpose of programs created by State law that are intended to maximize the creation of affordable housing through private investment.

51.    These State statutes, including GML Article 16 and PHFL Articles 8-a, 11, 15, and 22, vest administrative authority over the programs, and in particular the setting of the business terms of urban development projects, in HPD, and provide for only a limited role by the Council.

## FIRST CAUSE OF ACTION
### (Preemption by the State Minimum Wage Law)

52.    As and for a first cause of action, plaintiff repeats and realleges the above allegations with the same force and effect as if fully set forth in this paragraph.

53.    Under directly applicable Court of Appeals precedent, the New York State Minimum Wage Law, codified as Labor Law Art. 19, §§ 650 *et seq.,* occupies the field of wage regulation. *Wholesale Laundry Board of Trade, Inc. v. City of New York*, 17 A.D. 2d 327 (1st Dept. 1962), *aff'd on op. below*, 12 N.Y.2d 998 (1963) (*Wholesale Laundry I*) (invalidating City law that sought to set minimum wages for all employees in the City); *Wholesale Laundry Board of Trade, Inc. v. City of New York*, 43 Misc. 2d 816 (Sup. Ct. N.Y. Co. 1964), *aff'd*, 22 A.D.2d 762 (1st Dept. 1964), *aff'd*, 15 N.Y.2d 604 (1964) (*Wholesale Laundry II*) (same).   Therefore, local laws regulating wages are preempted unless they fit within some exception to preemption.

17

54.     In *McMillen v. Browne*, 14 N.Y.2d 326 (1964), the Court of Appeals carved out two narrow exceptions to preemption, neither of which is applicable here.  First, the Court held that a local law that applied only to City contractors and subcontractors who furnished "supplies, material or equipment . . . or . . . work, labor or services" to the City was not subject to preemption if the City was acting in its proprietary capacity.  This exception has been greatly narrowed by subsequent Court of Appeals decisions.

55.     Under current law, a state or municipality, even when acting as a purchaser of goods, labor, or services, is not acting in a proprietary capacity, and is therefore subject to preemption, when it uses its power as a purchaser to advance policy goals.  The Living Wage Law is preempted because it is explicitly intended to assist in the maintenance or creation of middle class jobs in the City.  This is a regulatory and a policy goal, not a proprietary one.

56.     *McMillen*'s second exception to preemption was based on home rule provisions in the State constitution and Municipal Home Rule Law that specifically permit localities to regulate wages of their contractors and subcontractors so long as such regulations are not inconsistent with State law.  N.Y. Const. Art. IX, § 2(c); MHRL § 10(1)(ii)(a)(10).  These provisions apply only to City contractors and subcontractors who perform "work, labor or services" for the locality, *i.e.*, to procurement contractors and subcontractors, and not to the persons or entities to which the Living Wage Law applies.  Moreover, more recent cases regarding procurement contracts have held that local laws that impose policy-related conditions on procurement contracts are, in fact, inconsistent with State law, and therefore invalid, if those conditions elevate costs and reduce competition.

57.     The Living Wage Law seeks to leverage certain development programs in order to impose a minimum wage upon portions of the private sector that is higher than the State-

specified minimum wage.  Its purpose, means, and intended effect all infringe upon the subject

matter and substance of Article 19 of the Labor Law.  Further, the Law does not fit within any

exception to preemption.  Therefore, it is preempted by the New York State Minimum Wage

Law.

      58.    It would be unlawful for the Mayor or mayoral appointees to seek to enforce

the Living Wage Law against entities purportedly covered by that Law.

**SECOND CAUSE OF ACTION**
**(Violation of Municipal Home Rule Law §§ 11(1)(f)) and 22(2))**

      59.    As and for a second cause of action, plaintiff repeats and realleges the above

allegations with the same force and effect as if fully set forth in this paragraph.

      60.    Municipal Home Rule Law § 11, entitled "Restrictions on the adoption of

local laws," provides, in relevant part:

> 1. Notwithstanding any provision of this chapter, the legislative
> body shall not be deemed authorized by this chapter to adopt a
> local law which supersedes a state statute, if such local law:

* * * *

> f. Applies to or affects any provision of . . . the labor law.

MHRL §11(1).

      61.    Because the Living Wage Law "applies to or affects" the New York State

Minimum Wage Law, Labor Law §§ 650 *et seq.*, it is unauthorized and invalid.

      62.    Similarly, Municipal Home Rule Law § 22(2) provides that, "No local law

shall supersede any provision of a state statute except as authorized by the constitution, this

chapter or any other state statute."  Because the Living Wage Law is not authorized to supersede

the State Minimum Wage Law, it is invalid.

19

63.     It would be unlawful for the Mayor or mayoral appointees to seek to enforce the Living Wage Law against entities purportedly covered by that Law.

**THIRD CAUSE OF ACTION**
**(Preemption by the State IDA Law)**

64.     As and for a third cause of action, plaintiff repeats and realleges the above allegations with the same force and effect as if fully set forth in this paragraph.

65.     The Living Wage Law is also preempted insofar as it seeks to regulate the activities of NYCIDA, a public benefit corporation established under the New York State IDA Act, GML §§ 850 *et seq.*, and specifically by GML § 917.

66.     As the New York State Attorney General has opined, "only the State Legislature [is] empowered to legislate regarding the powers and functions" of an Industrial Development Agency.  1976 N.Y. Op. (Inf.) Att'y Gen. 250, 1976 N.Y. AG LEXIS 148,*5 (Aug. 31, 1976).  A county's IDA "is not a part of the county government; the IDA's powers are derived directly from the State, not from or through the county.  The county's relationship with the . . . County IDA is determined not by home rule but by the Legislature."  1981 N.Y. Op. (Inf.) Att'y Gen. 272, 1981 N.Y. AG LEXIS 27, *3 (Oct. 19, 1981).

67.     In enacting the IDA Act and the statute creating NYCIDA, the Legislature expressly occupied the field.  GML § 888 provides:  "Insofar as the provisions of this title are inconsistent with the provisions of any other act, general or special, or of any local laws of the municipality, the provisions of this title shall be controlling . . . ."  GML § 888 is virtually identical to section 7405 of the Unconsolidated Laws, which the First Department found to be preemptive in *New York City HHC v. Council of the City of New York*, 303 A.D.2d 69, 77 (1st Dept. 2003).

68.    The comprehensive provisions of GML Article 18-A, §§ 850 *et seq.*, and

§ 917 (creating NYCIDA) also evidence the Legislature's intent to occupy the field.   The

purpose of an IDA is:

> to promote, develop, encourage and assist in the acquiring,
> constructing, reconstructing, improving, maintaining, equipping
> and    furnishing    industrial,    manufacturing,    warehousing,
> commercial, research and recreation facilities . . . , and thereby
> advance the job opportunities, health, general prosperity and
> economic welfare of the people of the state of New York and to
> improve their recreation opportunities, prosperity and standard of
> living.

GML § 858.

69.    To accomplish these ends, the Legislature granted IDAs, including NYCIDA,

particular powers, including but not limited to the following:

> (4) To acquire by purchase, grant, lease, gift, pursuant to the
> provisions of the eminent domain procedure law, or otherwise and
> to use, real property or rights or easements therein necessary for its
> corporate purposes in compliance with the local zoning and
> planning regulations  . . . , and to sell, convey, mortgage, lease,
> pledge, exchange or otherwise dispose of any such property in
> such manner as the agency shall determine.
>
> * * * *
>
> (9) To make contracts and leases, and to execute all instruments
> necessary or convenient to or with any person, firm, partnership or
> corporation, either public or private; provided, however, that any
> extension of an existing contract, lease or other agreement entered
> into by an agency with respect to a project shall be guided by the
> provisions of this article;
>
> (10) To acquire, construct, reconstruct, lease, improve, maintain,
> equip or furnish one or more projects;
>
> (11) To accept gifts, grants, loans, or contributions from, and enter
> into contracts or other transactions with, the United States and the
> state or any agency of either of them, any municipality, any public
> or private corporation or any other legal entity, and to use any such
> gifts, grants, loans or contributions for any of its corporate
> purposes;

21

(12) To borrow money and to issue bonds and to provide for the rights of the holders thereof;

(13) To grant options to renew any lease with respect to any project or projects and to grant options to buy any project at such price as the agency may deem desirable;

\* \* \* \*

(17) To do all things necessary or convenient to carry out its purposes and exercise the powers expressly given in this title.

GML § 858.

70.     The Living Wage Law dictates wage terms to recipients of financial assistance from NYCIDA who meet the Law's criteria.  In so doing, it specifically targets NYCIDA, along with NYCEDC, mandating an important condition for providing assistance to NYCIDA projects, and thus interfering with NYCIDA in the exercise of the above core powers conferred upon it by the State Legislature.

71.     Because the Living Wage Law is in conflict with, and inconsistent with, State law, it is preempted.

72.     It would be unlawful for the Mayor or mayoral appointees to seek to enforce the Living Wage Law entities purportedly covered by the Law by virtue of receiving NYCIDA assistance.

### FOURTH CAUSE OF ACTION
### (Municipal Home Rule Law § 10(5))

73.     As and for a fourth cause of action, plaintiff repeats and realleges the above allegations with the same force and effect as if fully set forth in this paragraph.

74.     Municipal Home Rule Law § 10(5) provides that "a local government shall not have power to adopt local laws which impair the powers of any other public corporation."

75.     The General Construction Law defines "public corporation" to include public benefit corporations.  GCL § 66(1).

76.     Pursuant to the IDA Act, all local IDAs, of which NYCIDA is one, are public benefit corporations.  GML § 856(2).

77.     As alleged above, the Living Wage Law, which specifically targets NYCIDA and dictates to it an important term of its projects, interferes with NYCIDA in the exercise of core powers conferred upon it by the State Legislature.  It therefore violates Municipal Home Rule Law § 10(5), and it would be unlawful for the Mayor or mayoral appointees to seek to enforce the Law against entities purportedly covered by it by virtue of receiving NYCIDA assistance.

### FIFTH CAUSE OF ACTION
### (Preemption of the Living Wage Law by State
### Affordable Housing Statutes)

78.     As and for a fifth cause of action, plaintiff repeats and realleges the above allegations with the same force and effect as if fully set forth in this paragraph.

79.     The Living Wage Law is preempted by the statutory scheme of the General Municipal Law and Private Housing Finance Law, which authorizes the City to provide financial assistance to private developers and others for the construction and rehabilitation of affordable housing.  This assistance can take the form, first, of real property sales for less than market value, without public auction or sealed bids pursuant to GML Article 16 or PHFL Article 11, and second, of loans to finance construction and building rehabilitation in urban areas pursuant to PHFL Articles 8-a, 15, and 22.

80.     Each of these statutes empowers HPD to administer the incentive programs and, conversely, strictly limits or altogether precludes involvement by the Council.  In this

manner, the statutes neither contemplate nor countenance intrusion by the Council in the form of a blanket wage requirement that inhibits the efficacy of the statutory incentive programs.

81.    GML Article 16, for example, authorizes HPD, subject to the Mayor's approval, to sell property without public auction or sealed bids to a sponsor as designated by HPD. GML § 695(2)(b). The Council's role is limited to giving approval to the overall project in the first instance, *id.* § 694(3), after which the property disposition itself is left to the discretion of HPD and the Mayor. Likewise, in authorizing municipalities to make loans to support urban development projects, GML Article 16 and PHFL Articles 11, 15, and 22 vest administrative authority – and in particular, the power to set the business terms of the projects – almost entirely in HPD rather than the Council. GML §§ 696(a), 696(d); PHFL §§ 576(c), 802, 1152. Where the Council is authorized to play some role in connection with the terms of an assistance project, as with PHFL Article 8-a loans, that role is limited to setting terms necessary to secure repayment of the loan, and the statute does not contemplate the insertion of conditions extraneous to repayment. PHFL § 452(2).

82.    In creating the statutory schemes for these assistance programs, the Legislature assigned particular roles to the Mayor, HPD, and the Council. Where it wanted to give the Council some limited role, it did so. Where the Council is given no role, it may not interfere with the administration of these State-authorized programs. By subjecting developers and others who receive assistance under these statutes to the living wage requirement, the Council dictates the terms of the assistance. This intrusion by the Council is inconsistent with the statutes' administrative frameworks, which expressly give the Mayor and HPD, rather than the Council, authority to implement the programs, and in particular, to set the business terms for the development projects.

83.     The purpose of these State statutes is to create financial incentives for private investment in the construction and rehabilitation of deteriorating buildings, where blighted conditions and other factors discourage private investment.  By increasing the cost of labor in connection with any development project that triggers the Law's wage requirement, and thus increasing the cost of the project as a whole, the Living Wage Law frustrates this purpose.

84.     For these reasons, the Living Wage Law is preempted, and it would be unlawful for the Mayor or mayoral appointees to seek to enforce that Law against entities purportedly covered thereby.

### SIXTH CAUSE OF ACTION
**(Curtailment of the Mayor's Authority to Establish the
Terms of Disposition of City Property and the Authority
of the Mayor and other City Officials to Review the
Land Use Implications of Such Dispositions)**

85.     As and for a sixth cause of action, plaintiff repeats and realleges the above allegations with the same force and effect as if fully set forth in this paragraph.

86.     Any local law that "[a]bolishes, transfers or curtails any power of an elective officer" "shall be subject to a mandatory referendum" of the voters.  MHRL § 23(2).  The City Charter likewise requires that a local law be approved by referendum if it transfers or curtails "any power" of an elective official such as the Mayor, or transfers power from a mayoral to a non-mayoral appointee or entity, or curtails the powers of the City Planning Commission.  N.Y. City Charter § 38(5), 38(11), and 38(16).

87.     The Living Wage Law is invalid because it has not been approved by referendum even though it curtails the power granted to the Mayor under the Charter to dispose of City real property on terms that he or she alone sets.

88.    Many major City economic development projects involve the sale or lease of City real property to third parties at below market rates.   Such sales are accomplished through NYCEDC.  State law and the New York City Charter give the Mayor the power to convey City real property to NYCEDC or any other local development corporation for economic development or other public purpose without competitive bidding, and on terms that the Mayor may set, subject only to the approval of the Borough Board.  Historically, the terms of the dispositions set by Mayors have required the local development corporation to, in turn, dispose of the property to a specific purchaser and on specific terms set forth in the Mayoral approval.

89.    Section 384(b)(4) of the New York City Charter assigns to the Mayor the authority to sell or lease property to a local development corporation.  The Mayor authorizes such sales or leases subject to the local development corporation's obligation to dispose of the property in a specific manner.  Under § 384(b)(4), the Mayor is authorized, subject only to the subsequent approval of the pertinent Borough Board, to lease or sell real property of the City "to a local development corporation without competitive bidding and for such purpose or purposes and at such rental or for such price as may be determined by the mayor to be in the public interest."  Charter § 384(b)(4).  This provision explicitly overrides any contrary law, general or special or local.  *Id.*

90.    Section 384(b)(4) operates in tandem with section 1411 of the Not-for-Profit Corporation Law, which authorizes governmental entities to create local development corporations to advance a wide array of public purposes related to economic development. NPCL § 1411(a).  Pursuant to NPCL § 1411, NYCEDC was created to assist in furthering the economic development goals of certain City real property dispositions, as well as to implement other economic development initiatives.

91.   The Charter's text and structure provide a context for the power granted the Mayor in Charter § 384(b)(4).  This context reveals the limited role played by the Council in this area, and shows that the power granted to the Mayor in that paragraph functions as a component of a rational scheme.  Section 384(b)(5) provides that dispositions of City property are subject to the Uniform Land Use Review Process ("ULURP") of Chapter 8 of the Charter and states that review in the ULURP process is "limited to the land use impact and implications of the transaction."  *Id.* § 384(b)(5).  The Council's role in the ULURP process is in turn defined by Charter § 197-d, which provides for various procedures by which the Council can review different types of dispositions of City real property.  The Council cannot regulate the disposition of property outside the ULURP process, because Charter § 28(a) limits the Council's role:

> The power of the council to act with respect to matters set forth in section[ ] one hundred ninety seven-c [the main ULURP provision] . . . shall be limited by the provisions of section one hundred ninety seven-d [the section defining the Council's role in ULURP].

Thus, the Council's role with respect to real property dispositions is limited to its review of the land use implications of these dispositions on an individualized basis.

92.   Contrary to this statutory scheme, which assigns to the Mayor the power to impose the terms of property dispositions, the Council here is imposing a specific term on every disposition of property pursuant to Charter § 384(b)(4).  Under the Living Wage Law, any disposition of City property by the Mayor through NYCEDC in connection with a project that receives City financial assistance as defined by that Law, and that meets the other criteria of the Law, is subject to the wage regulation terms of the Law.

93.   By limiting the Mayor's discretion in setting the terms and conditions of property dispositions and inserting the Council into matters specifically denied to it by the structure and text of the Charter, the Living Wage Law curtails the Mayor's power.

27

94.    Further, by effectively eliminating the possibility of disposition of real property in certain cases, the Council has improperly used the local law process to curtail the powers of other City officials and bodies essential to the City's governmental structure, including the City Planning Commission, the Borough Presidents, and the Community Boards, to make recommendations and take actions in the ULURP process. *See* Charter §§ 197-c, 197-d; *see also* Charter § 38(11) and 38(16).

95.    By enacting the Living Wage Law, the Council would impose a non-land use related condition upon the ULURP process in excess of its prescribed role, thereby effectively preventing some property dispositions, and the related development initiatives, from proceeding at all. This circumvention of the limitations imposed upon the Council so as to eliminate or alter the role of the Mayor, the Borough Presidents, and other City officials whose roles are defined by the Charter curtails the powers of those officials.

### SEVENTH CAUSE OF ACTION
### (Curtailment of the Mayor's Executive Enforcement Authority and Transfer of Authority to the Comptroller)

96.    As and for a seventh cause of action, plaintiff repeats and realleges the above allegations with the same force and effect as if fully set forth in this paragraph.

97.    Under the Living Wage Law, the Comptroller shares implementation and enforcement powers with the Mayor in a manner that impermissibly curtails the executive power of the Mayor and transfers mayoral powers to the Comptroller.

98.    In particular, the Living Wage Law gives the Comptroller the authority to:

- monitor the compliance of covered employers, lessors, and developers, N.Y.C. Admin. Code § 6-134(g)(1);

- conduct investigations whenever there is reason to believe a violation has occurred, with the express authorization to observe work being performed, interview employees, and examine the books and records relating to payrolls, *id.*;

28

- request, at the start of any investigation, that the City or City Economic Development Entity withhold any payment due to the financial assistance recipient pursuant to withholding procedures established by State Labor Law, *id.* § 6-134(g)(1);

- "report the results of [any] investigation to the mayor, or his or her designee, who shall, . . . where appropriate issue an order, determination, or other disposition, including, but not limited to, a stipulation of settlement," *id.* § 6-134(g)(2);

- inspect the payroll records of covered employers, *id.* § 6-134(f)(3);

- request certified original payroll records from covered employers, *id.* § 6-134(e)(2);

- receive from financial assistance recipients annual certifications stating that all employees are paid no less than the requisite wage, *id.* § 6-134(f)(1);

- prepare written notices to be provided to employees, detailing the wages, benefits, and other protections to which employees are entitled and inviting employees to request that the Comptroller launch an investigation, *id.* § 6-134(e)(1).

99.     Under the Charter, the Comptroller does not have the power to administer programs, to regulate, or to enforce. *See* Charter § 93.  Under § 3 of the Charter, the power to administer programs and enforce laws rests squarely with the Mayor, as the chief executive officer, and with his or her appointees.  By giving enforcement powers to the Comptroller, consolidating information gathering duties in the Comptroller's office, and mandating that mayoral agencies obey the Comptroller's determinations, the Living Wage Law impermissibly encroaches on the Mayor's authority and the discretion of the mayoral agencies.

100.     Further, the Living Wage Law unlawfully requires the Mayor to share investigatory and enforcement power with the Comptroller, giving both the Comptroller and the Mayor power to receive complaints and conduct investigations based on such complaints. N.Y.C. Admin. Code §§ 6-134(g)(6), 6-134(g)(8), 6-134(g)(9).

101.     The Mayor possesses the sole power to implement and enforce local laws, and a delegation of this authority to the Comptroller is a curtailment that is impermissible absent

a referendum.  In giving the Comptroller rather than the Mayor the lead role in the enforcement

scheme, in derogation of the Mayor's executive authority, the Living Wage Law impairs a power

conferred on the Mayor as part of the framework of local government.

**EIGHTH CAUSE OF ACTION**
**(Violation of N.Y. State Constitution, Art. IX, §3(a)(2)**
**and Municipal Home Rule Law §11(1)(e))**

102.    As and for a eighth cause of action, plaintiff repeats and realleges the above

allegations with the same force and effect as if fully set forth in this paragraph.

103.    Article IX, section 3, of the New York State Constitution provides in relevant

part: "(a)  Except as expressly provided, nothing in this article shall restrict or impair any power

of the legislature in relation to: . . . (2) The courts as required or provided by article VI of this

constitution."

104.    In  addition,  Municipal  Home  Rule  Law  §  11(1)(e)  provides  that

"[n]otwithstanding  any  provision  of  this  chapter,  the  legislative  body  shall  not  be  deemed

authorized by this chapter to adopt a local law which supersedes a state statute, if such local law:

. . . e.  Applies to or affects the courts as required or provided by article six of the constitution."

105.    The Living Wage Law provides that enforcement orders may be filed with

one  or  more  county  clerks,  and  that  such  orders  are  to  have  the  "full  force  and  effect  of  a

judgment duly docketed in the office of such clerk," so that they can be entered in the same

manner as money judgments under the Civil Practice Law and Rules.  N.Y.C. Admin. Code

§ 6-134(g)(5).

106.    This provision is unlawful because it exceeds the constitutional home rule

powers of the City Council, in that they relate to the courts and the filing of local decisions with

30

county clerks, acting in relation to the New York State court system.  N.Y. Const., Art. IX, §3(a)(2); MHRL §11(1)(e).

107.    For this reason, it would be unlawful for the Mayor or mayoral appointees to seek to enforce the Living Wage Law.

## NINTH CAUSE OF ACTION
### (ERISA Preemption)

108.    As and for a ninth cause of action, plaintiff repeats and realleges the above allegations with the same force and effect as if fully set forth in this paragraph.

109.    Because it mandates that covered employees must provide health benefits or a cash equivalent to employees, the Living Wage Law is a law that relates to employee benefit plans and is therefore preempted by ERISA, 29 U.S.C. §§ 1001 *et seq.*, which preempts State laws insofar as they relate to any employee benefit plan covered by the Act.  29 U.S.C. § 1144(a).

110.    As defined by ERISA, employee benefit plans include any "plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services." 29 U.S.C. § 1002(1).

111.    ERISA prohibits states or localities from mandating or favoring certain benefits over others.  By mandating that covered employees must provide health benefits or cash, without crediting employers for other benefits they may provide, the Living Wage Law impermissibly favors health benefits over other benefits.  Even if employers attempt to pay a cash wage, they will have to coordinate the health benefits spending required by the Living

Wage Law with their existing ERISA plans.   Any law that requires such coordination is preempted.

112.    Moreover, the effect the Living Wage Law will have on ERISA plans and plan sponsors runs counter to the purpose of ERISA.  The purpose of the ERISA preemption provision was to ensure that plans and plan sponsors would be subject to a uniform system of benefits law so as to minimize the administrative and financial burden of complying with conflicting directives and to avoid the need to tailor plans and employer conduct to the peculiarities of the law of each jurisdiction.  The Living Wage Law will require employers to do exactly what ERISA aims to prevent:   tailor their plans to the peculiarities of a particular jurisdiction's laws.   By dictating that employers must provide health benefits, without any consideration of other benefits employers may provide, the Living Wage Law has a connection with ERISA employee plans and imposes on employers to the very burdens Congress sought to avoid by enacting ERISA.

113.    Accordingly, the Living Wage Law is preempted by ERISA., and it would be unlawful for the Mayor or mayoral appointees to seek to enforce that Law.

**WHEREFORE**, plaintiff respectfully requests a declaratory judgment that the Living Wage Law is invalid, without force or effect; a permanent injunction enjoining the operation and implementation of the Law; and such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          September 5, 2012

                              **MICHAEL A. CARDOZO**
                              Corporation Counsel of the
                                City of New York
                              Attorney for Plaintiff
                              100 Church Street
                              New York, NY 10007
                              (212) 788-1007

                              By: _John R. Low-Beer_

Of counsel:   Andrea Berger
              Spencer Fisher
              Brian T. Horan